UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

JOHN ERIN BINNS,

    Plaintiff,

v.

FEDERAL BUREAU OF INVESTIGATION, et al.

    Defendants.

Civil Action No. 1:20-cv-02547 (CJN)

## DECLARATION OF MICHAEL G. SEIDEL

I, Michael G. Seidel, declare as follows:

(1)  I am the Section Chief of the Record/Information Dissemination Section ("RIDS"), Information Management Division ("IMD"), Federal Bureau of Investigation ("FBI"), Winchester, Virginia. I joined the FBI in September 2011, and prior to my current position, I was the Assistant Section Chief of RIDS from June 2016 to July 2020; Unit Chief, RIDS Litigation Support Unit from November 2012 to June 2016; and an Assistant General Counsel, FBI Office of General Counsel, Freedom of Information Act ("FOIA") Litigation Unit, from September 2011 to November 2012. In those capacities, I had management oversight or agency counsel responsibility for FBI FOIA and Privacy Act ("FOIPA") litigation cases nationwide. Prior to my joining the FBI, I served as a Senior Attorney, U.S. Drug Enforcement Administration ("DEA") from September 2006 to September 2011, where among myriad legal responsibilities, I advised on FOIPA matters and served as agency counsel representing the DEA in FOIPA suits nationwide. I also served as a U.S. Army Judge Advocate General's Corps Officer in various assignments from 1994 to September 2006 culminating in my assignment as

1

Chief, General Litigation Branch, U.S. Army Litigation Division where I oversaw FOIPA litigation for the U.S. Army. I am an attorney registered in the State of Ohio and the District of Columbia.

(2) In my official capacity as Section Chief of RIDS, I supervise approximately 237 FBI employees, supported by approximately 91 contractors, who staff a total of ten (10) Federal Bureau of Investigation Headquarters ("FBIHQ") units and two (2) field operational service center units whose collective mission is to effectively plan, develop, direct, and manage responses to requests for access to FBI records and information pursuant to the FOIA as amended by the OPEN Government Act of 2007, the OPEN FOIA Act of 2009, and the FOIA Improvement Act of 2016; the Privacy Act of 1974; Executive Order 13526; Presidential, Attorney General, and FBI policies and procedures; judicial decisions; and Presidential and Congressional directives. The statements contained in this declaration are based on my personal knowledge, upon information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith.

(3) Because of the nature of my official duties, I am familiar with the procedures followed by the FBI in responding to requests for information from its files pursuant to the provisions of the FOIA, 5 U.S.C. § 552. Specifically, I am aware of the FBI's handling of Plaintiff's FOIA requests for records related to investigations involving crimes using the Mirai botnet[1] and the Satori botnet.

---

[1] A bot is a software program that operates on the internet and performs repetitive tasks. A botnet is a collection of internet-connected devices, each of which is running one of more bots. Botnets can be used to perform Distributed Denial-of-Service ("DDoS") attacks, steal data, send spam, and allow the attacker to access a device and its connection.

2

(4) This declaration is submitted in support of the FBI's Motion for an Order Preserving Certain Exemptions and Bifurcating Proceedings. In order to provide the Court and Plaintiff with an explanation of the basis for the amount of time requested by the FBI to review responsive records, this declaration provides: 1) a description of the nature of the responsive records; 2) the FBI's current workload; and 3) a proposed processing schedule for both categorical 7(A) bifurcated review and full categorical review of the responsive records, including an explanation of the process the FBI uses to perform the respective reviews at the litigation stage.

## I. NATURE OF THE RESPONSIVE RECORDS

(5) Through searches of its records, the FBI located pending investigative files pertaining to Mirai botnet attacks and Satori botnet attacks.

(6) The FBI's RIDS contacted the case agents for the responsive investigative files to determine whether the release of the information within these files would cause harm to pending enforcement proceedings. The FBI's case agents outlined the harm associated with the potential release of the records because information and evidence contained within the FBI's investigatory files could be used in the government's future prosecution of individuals under investigation for criminal botnet activity. Thus, release of any of this information would be premature and allow for these investigative targets to potentially prepare alibis, intimidate potential witnesses, and/or destroy evidence of any wrongdoing (through the investigative targets' efforts or by proxy) to thwart the United States' attempts to prosecute these individuals. Additionally, a press release from the Department of Justice United States Attorney's Office for the District of Alaska dated September 18, 2018, stated several individuals were prosecuted for their roles in creating and

operating two (2) botnets which targeted Internet of Things ("IoT")[2] devices. These individuals reportedly cooperated with law enforcement and as a part of their sentences the defendants must continue to cooperate with the FBI on cybercrime and cybersecurity matters as well as continued cooperation with and assistance to law enforcement. **Ex. A.** Thus, these investigations remain on-going and information collected as a result of some of the prosecutions has not been made public and continues to be relevant in on-going efforts by the FBI to investigate these types of crimes. The pre-mature disclosure of any information associated with these cases would clearly cause harm to the on-going criminal investigations.

(7) Under 5 U.S.C. § 552(b)(7)(A), an agency may categorically deny access to records if the records were compiled for law enforcement purposes and the production of such records could reasonably be expected to interfere with law enforcement proceedings. In this case, the FBI identified main and cross reference files responsive to Plaintiff's requests, the release of which could reasonably be expected to interfere with pending law enforcement proceedings. As a result, the FBI is categorically denying access to these records under FOIA Exemption (b)(7)(A) because the production of such records could reasonably be expected to interfere with law enforcement proceedings.

## II. THE FBI'S FOIA WORKLOAD
### UNPREDICTABLE GROWTH IN THE NUMBER OF REQUESTS SUBMITTED TO THE FBI

(8) The FBI is currently inundated with an extraordinary amount of Freedom of Information/Privacy Act ("FOIPA") requests. In recent years the FBI has experienced a spike in requests submitted to the agency. In Fiscal Year ("FY") 2020, the FBI received 30,304 FOIPA requests (a 47% increase over intake from five years ago), when in FY 2015, intake was 18,799

---

[2] IoT refers to non-traditional computing devices that are connected to the internet, including wireless cameras, routers, and digital video recorders.

requests. In FY 2020, the FBI resolved 28,663 FOIPA requests and reviewed over 700,000 pages of records in response to FOIPA requests. Additionally, the FBI's ability to respond to FOIA and Privacy Act requests during the COVID-19 pandemic was seriously hindered. On March 17, 2020, RIDS temporarily halted FOIA processing in response to the COVID-19 pandemic. IMD leadership continually monitored the situation and ultimately concluded that it could begin bringing employees back to work safely in a limited fashion in order to resume FOIA operations starting on April 29, 2020. By June 8, 2020, RIDS was able to authorize returning to a 100% staffing posture. Nevertheless, through the summer and fall, RIDS continued to experience less than full staffing as employees and contractors were exposed to the virus and required to quarantine. In order to ensure the health and safety of RIDS and other IMD personnel, their families, and their communities, IMD management concluded that it was necessary to draw down its physical presence and footprint in its facilities by maximizing spacing and reducing the number of personnel in the office to mitigate exposure and spread of the virus. At the same time, IMD management recognized the importance of the continued operability of the FOIA program to the American people. To that end, RIDS reduced to a 50% staffing posture on Monday, December 7, 2020. By April 11, 2021, RIDS was able to authorize returning to a 100% staffing posture but continues to work through its backlog of FOIA requests.

### INCREASE IN COMPLEXITY OF REQUESTS

(9)     In cases like this where there are thousands of pages, the volume of material proportionally impacts - and dramatically affects - the complexity of the FOIPA processing required as well as the resources and time needed to respond to a particular request. The FBI's experience is that as the number of pages in a request increases, the work and complexity associated with responding to a request proportionally increases as well. This includes increases in the number of referrals (for either consultation or direct response) to other DOJ components

5

and agencies, the need for internal reviews, classification/declassification considerations, and the time needed to conduct page-by-page, line-by-line reviews of all potentially responsive material to determine what can be released and/or withheld.

## III. PROPOSED PROCESSING SCHEDULE

### A. BIFURCATED REVIEW

(10)    During a categorical bifurcated 7(A) review, the FOIA analyst must (1) review each record on a document-by-document basis; (2) identify the type of document (*e.g.*, e-mail, electronic communication, interview, investigative report, etc.); (3) group the documents into functional categories (i.e., administrative, evidentiary/investigative, or public source/non-investigative harm materials); and (4) analyze each record to determine if its release would interfere with ongoing law enforcement proceedings. If the analyst determines the release of the particular document could interfere with any enforcement proceeding, the record is exempt in its entirety. If segregable information (e.g., public source) is located, the analyst will then process the information for release to the Plaintiff.

(11)    In addition to asserting FOIA Exemption (b)(7)(A) and assigning a functional category to each document, an agency must also assert all underlying exemptions during the original district court proceeding, unless bifurcation is requested and granted by the Court. The process of reviewing Exemption (7)(A) material for additional underlying exemptions transforms the review process from a categorical document-by-document review to a much lengthier review to identify additional, underlying exemptions for assertion despite the blanket coverage of Exemption 7(A).

(12)    The FBI respectfully requests an order permitting it to move for summary judgment based on the applicability of Exemption 7(A) without waiving its ability to assert

6

additional FOIA exemptions in the future. If the Court grants the FBI's motion, Exemption 7(A) would be litigated given its categorical applicability, and in the event Exemption 7(A) would expire during the pendency of this FOIA litigation – or if the Court rejects the FBI's withholdings under Exemption 7(A) – the underlying exemptions would be preserved. If the motion is granted, the FBI requests twenty-two (22) months to identify documents for withholding under functional Exemption 7(A) categories as well as process and release to Plaintiff any additional segregable material. The requested processing schedule takes into consideration the volume of documents involved in this case and will provide adequate time for the FBI to review and categorize each record as well as identify and release all segregable material. In 7(A) cases, the FBI does not identify the total page count of records as that would reveal the nature, scope, and intensity of the FBI's investigative efforts and resources allocated in these types of crimes. However, the FBI reports that given the volume of records identified as responsive in this case-- records that are connected with numerous FBI Field Offices-- the FBI estimates that twenty-two (22) months would provide an adequate period of time to conduct the 7(A) review described above. These are initial estimates and additional voluminous records were located; therefore, the FBI will update the Court during status reports of the volume and if additional time is needed for review. The FBI also requests three (3) additional months to prepare and file a declaration fully explaining its assertion of Exemption 7(A). The FBI will provide interim releases of any segregable material located during its review.

## B. FULL REVIEW FOR UNDERLYING EXEMPTIONS

(13) Traditionally, the effort and time necessary to process a 7(A) case when bifurcation is denied was comparable to that required to process a non-7(A) case.[3] However, the FBI recently developed a leveraging optical character recognition ("OCR") technology and electronic searches to more efficiently review categorically exempt records. This process has greatly reduced the amount of time necessary for the review of underlying Exemptions and functional categories. However, there are still factors that impact the additional amount of time required to process records when bifurcation is denied.

(14) A full review for all applicable underlying exemptions requires RIDS to obtain all portions of the files not electronically available. Rather than relying on document summaries to further explain the role of documents in the pending investigation or prosecution, and how release of these documents could harm pending law enforcement proceedings, RIDS must analyze each document for information exempt under one or more other exemptions. The determination for many of these exemptions entails further research and extensive legal analysis. For example, when a document indicates that information within was provided by a confidential source, the analyst must then research the source to determine if they were granted an express assurance of confidentiality or if the FBI can protect the source's information pursuant to

---

[3] Historically, since there was no practical difference between the steps involved in processing a 7(A) case versus a non-7(A) case where underlying exemptions must be identified and asserted, the FBI applied its standard interim release policy of reviewing and processing the records in 500-page increments. This 500-pages-per-month interim release policy was established on or about January 2010. In reviewing the FBI's interim release policy, in the context of the fees charged for the monthly 500-page releases, the U.S. Court of Appeals for the District of Columbia Circuit endorsed the FBI's interim policy, recognizing it "serves to promote efficient responses to a larger number of requesters" based on the FBI's "reasonable" and "non-obstructionist" explanation of its program objective of providing more requesters with more pages on a consistent basis. *See National Security Counselors, et al. v. United States Department of Justice,* 848 F.3d 467, 472 (D.C. Cir. 2017).

8

Exemption 7D based on a presumption of confidentiality (implied confidentiality). Such research can be rather time consuming and has little to no bearing on the fact that the FBI will continue to withhold the entire record pursuant to Exemption 7(A); essentially, the same amount of effort is required, while neither positively nor negatively affecting the actual release of the information while Exemption 7(A) remains intact.

(15)  A review for all applicable exemptions also requires RIDS to conduct a classification review, which is necessary in order to assert Exemption (b)(1). This means the documents are not solely reviewed by a RIDS FOIA analyst, they are also reviewed by a RIDS Classification analyst. Classification analysts are specifically trained to research, review, and make classification determinations on FBI information. Only a small portion of RIDS analysts are qualified to conduct classification reviews relative to those applying FOIA exemptions. This is yet another factor that increases the amount of additional time required when asserting all exemptions at once.

(16)  The FBI must also locate all other government agency ("OGA") equities within the records and consult with the OGA as to how they wish their information to be treated. Such consultations are not fully within the FBI's control and the FBI must rely on the ability of the OGA to provide timely responses to its consultation requests. The FBI's experience from other ongoing litigation consultations with OGAs during the COVID-19 pandemic is that not all OGAs have returned to full capacity, and many are still utilizing telework. Some OGAs handling classified information have a very limited number of personnel able to review classified information on-site and this has resulted in significant backlogs and delays in response.

(17)  Upon completion of the initial review of the responsive records for applicable underlying exemptions and completion of any OGA consultations, multiple layers of review by

an Expert level analyst and/or Supervisors in each unit involved (*i.e.*, FOIA and/or Classification Units) is conducted to ensure accuracy and adequate protection of exempt FBI equities. Additionally, for cases in litigation, the processing may undergo additional review by a RIDS Litigation Support analyst, an attorney from the FBI's Office of General Counsel, and/or the Assistant United States Attorney representing the FBI in the matter for the purpose of ensuring that all redactions are legally defensible. These are just a few of the factors that impact the amount of time required to process records when bifurcation is denied.

(18) Considering the preceding factors, in the event the FBI's motion for bifurcation is denied, the FBI requests forty-four (44) months to complete the review needed to assert all applicable underlying exemptions. The FBI also requests three (3) additional months to prepare and file a declaration detailing the FBI's FOIA Exemption 7(A) claim as well as explaining each underlying FOIA Exemption.[4]

## CONCLUSION

(19) The FBI is currently inundated with a deluge of incoming FOIPA requests and pending FOIPA litigations and has a statutory responsibility to allocate its limited resources equitably to serve all requesters. The FBI requests an order permitting bifurcation of these proceedings and permission to move for summary judgment based on the applicability of Exemption 7(A) to certain records covered by that exemption, without waiving any allegation that those records are exempt from release pursuant to additional underlying exemptions. If a bifurcation order is granted, Exemption 7(A) would be litigated given its categorical

---

[4] In the event the pending enforcement proceeding on which the viability of Exemption 7(A) relies concludes, the FBI will require additional time to conduct a page-by-page, line-by-line review and portion mark any information exempt pursuant to applicable FOIA Exemptions at a rate of 500 pages per month in accordance with the FBI's standard processing practices.

applicability, and in the unlikely event that Exemption 7(A) would expire during the pendency of this FOIA litigation – or if the Court rejects the FBI's withholdings under Exemption 7(A) – the underlying exemptions would be preserved. If the FBI's motion is granted, the FBI respectfully requests twenty-two (22) months to identify documents for withholding under functional Exemption 7(A) categories as well as process and release to Plaintiff any additional segregable material. If the FBI's request for bifurcation is denied, the FBI requests forty-four (44) months to complete the review process needed to assert all applicable underlying exemptions (including consultations with other government agencies). Additionally, after processing is complete the FBI also requests three (3) additional months to prepare and file a declaration detailing the FBI's FOIA Exemption 7(A) claim, and if bifurcation is not granted, also explaining the applicability of each underlying FOIA exemption, and to obtain justifications from other government agencies to defend their withholdings.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct, and that Exhibit A attached hereto is a true and correct copy.

Executed this 17th day of May 2021.

MICHAEL G. SEIDEL
Section Chief
Record/Information Dissemination Section
Information Management Division
Federal Bureau of Investigation
Winchester, Virginia

UNITED STATES DISTRICT COURT

DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN ERIN BINNS,<br><br>  Plaintiff,<br><br>         v.<br><br>FEDERAL BUREAU OF INVESTIGATION, et al.<br><br>  Defendants. | Civil Action No. 1:20-cv-02547 (CJN) |

# Exhibit A





U.S. Attorneys » District of Alaska » News

**Department of Justice**

U.S. Attorney's Office

District of Alaska

FOR IMMEDIATE RELEASE                    Tuesday, September 18, 2018

# Hackers' Cooperation with FBI Leads to Substantial Assistance in Other Complex Cybercrime Investigations

### Defendants Responsible for Creating the "Mirai" and Clickfraud Botnets Continue to Assist FBI as Part of their Sentencing

Anchorage, Alaska – U.S. Attorney Bryan Schroder announced today that three defendants have been sentenced for their roles in creating and operating two botnets, which targeted "Internet of Things" (IoT) devices. Paras Jha, 22, of Fanwood, New Jersey; Josiah White, 21, of Washington, Pennsylvania; and Dalton Norman, 22, of Metairie, Louisiana, were sentenced today by Chief U.S. District Judge Timothy M. Burgess. On Dec. 8, 2017, Jha, White, and Norman pleaded guilty to criminal Informations in the District of Alaska charging them each with conspiracy to violate the Computer Fraud & Abuse Act in operating the Mirai Botnet. Jha and Norman also pleaded guilty to two counts each of the same charge, one in relation to the Mirai botnet and the other in relation to the Clickfraud botnet.

After cooperating extensively with the FBI, Jha, White, and Norman were each sentenced to serve a five-year period of probation, 2,500 hours of community service, ordered to pay restitution in the amount of $127,000, and have voluntarily abandoned significant amounts of cryptocurrency seized during the course of the investigation. As part of their sentences, Jha, White, and Norman must continue to cooperate with the FBI on cybercrime and cybersecurity matters, as well as continued cooperation with and assistance to law enforcement and the broader research community. According to court documents, the defendants have provided assistance that substantially contributed to active complex cybercrime investigations as well as the broader defensive effort by law enforcement and the cybersecurity research community.

Jha, White, and Norman became subjects of a federal investigation when, in the summer and fall of 2016, they created a powerful botnet – a collection of computers infected with malicious software and controlled as a group without the knowledge or permission of the computers' owners. The Mirai Botnet targeted IoT devices – non-traditional computing devices that were connected to the Internet, including wireless cameras, routers, and digital video recorders. The defendants attempted to discover both known and previously undisclosed vulnerabilities that allowed them to surreptitiously attain control over the victim devices for the purpose of forcing the devices to participate in the Mirai Botnet. At its peak, Mirai consisted of hundreds of thousands of compromised devices. The defendants used the botnet to conduct a number of powerful distributed denial-of-service, or "DDoS" attacks, which occur when multiple computers, acting in unison, flood the Internet connection of a targeted computer or computers. The defendants' involvement with the

12/10/2020, Hackers' Cooperation with FBI Leads to Substantial Assistance in Other Complex Cybercrime Investigations | USAO-AK | Department o…

Case 1:20-cv-02547-CJN Document 13-1 Filed 05/10/21 Page 15 of 15

original Mirai variant ended in the fall of 2016, when Jha posted the source code for Mirai on a criminal forum. Since then, other criminal actors have used Mirai variants in a variety of other attacks.

Additionally, from December 2016 to February 2017, the defendants successfully infected over 100,000 primarily U.S.-based computing devices, such as home Internet routers, with malicious software. That malware caused the hijacked home Internet routers and other devices to form a powerful botnet. The victim devices were used primarily in advertising fraud, including "clickfraud," a type of Internet-based scheme that makes it appear that a real user has "clicked" on an advertisement for the purpose of artificially generating revenue.

"Cybercrime is a worldwide epidemic that reaches many Alaskans," said U.S. Attorney Bryan Schroder. "The perpetrators count on being technologically one step ahead of law enforcement officials. The plea agreement with the young offenders in this case was a unique opportunity for law enforcement officers, and will give FBI investigators the knowledge and tools they need to stay ahead of cyber criminals around the world."

"The sentences announced today would not have been possible without the cooperation of our partners in international law enforcement and the private sector," said Special Agent in Charge of FBI's Anchorage Field Office, Jeffery Peterson. "The FBI is committed to strengthening those relationships and finding innovative ways to counter cybercrime. Cyber criminals often develop their technical skills at a young age. This case demonstrates our commitment to hold criminals accountable while encouraging offenders to choose a different path to apply their skills."

These cases were investigated by the FBI's Anchorage Field Office. The Mirai Botnet and Clickfraud Botnet cases were prosecuted by Assistant U.S. Attorney Adam Alexander of the District of Alaska and Trial Attorney C. Alden Pelker of the Computer Crime and Intellectual Property Section of the Justice Department's Criminal Division. Additional assistance was provided by the FBI's Newark, New Orleans and Pittsburgh Field Offices, Homeland Security Investigations (HSI) Atlanta – Greenville South Carolina Office, the U.S. Attorneys' Offices for the Eastern District of Louisiana and New Jersey, the United Kingdom's National Crime Agency, the French General Directorate for Internal Security, the Police Service of Northern Ireland, the National Cyber-Forensics & Training Alliance, Palo Alto Networks Unit 42, Google, Cloudflare, Coinbase, Flashpoint, Oath, 360.cn and Akamai. Former Department of Justice prosecutors Ethan Arenson, Harold Chun, and Yvonne Lamoureux provided invaluable support during their tenure at DOJ.

**Topic(s):**
Cyber Crime

**Component(s):**
USAO - Alaska

Updated September 18, 2018